UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| G. MICHAEL MCNAMEE | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-02057 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MINXRAY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael McNamee entered into a licensing agreement with MinXray, Inc., in which McNamee licensed certain portable digital x-ray technology to MinXray for a period of seven years.[1] In exchange for the right to use the technology—which McNamee called the DIHP—MinXray was required to pay McNamee a royalty for each sale of one of its products that incorporated it. McNamee asserts in his Complaint that MinXray's products implemented proprietary technology that he invented outside of the DIHP, in violation of a non-disclosure agreement that the parties signed in 2006. He also claims that MinXray failed to pay him all the royalties to which he is entitled under the 2008 License Agreement for the DIHP product. Both McNamee and MinXray now move for summary judgment. For the reasons explained below, MinXray's motion is granted in its entirety and McNamee's motion is denied.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332. Citations to the docket are noted by "R." followed by the docket entry.

## I. Background

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates McNamee's summary judgment motion, MinXray gets the benefit of reasonable inferences; conversely, when evaluating MinXray's filing (which the Court interprets as a cross-motion), the Court gives McNamee the benefit of the doubt.

Michael McNamee and his wife operate a company called Professional Portable X-Ray, Inc. (which goes by the acronym "PPX") that provides portable x-ray services to their clients, which primarily are nursing homes. R. 37.4, McNamee Dep. at 11:1-14. MinXray, Inc. sells portable x-ray equipment that can be used outside of a hospital—such as at a nursing home or veterinary facility. R. 37.2, Kretchmer Dep. at 6:24-8:18. To make the x-ray equipment portable, MinXray attached it to a wheeled stand and called this product the "XGS stand." Kretchmer Dep. at 16:9-17:18; R. 37.3, Kretchmer Aff. ¶ 3. PPX was initially a customer of MinXray's and, by the early 2000s, it had purchased at least ten XGS stands. McNamee Dep. at 19:1-15. MinXray continues to sell the XGS stand today. Kretchmer Dep. at 17:2-11.

By the turn of the century, though, the x-ray industry started transitioning from traditional film to digital film, which required different components and technology. Kretchmer Dep at 10:4-23, 24:2-27:14; Kretchmer Aff. ¶¶ 4, 5. Soon companies, including Canon and Source-Ray began developing portable *digital* x-ray systems. Kretchmer Dep. at 10:24-11:23; McNamee Dep. at 22:15-24:12. In order to

keep up with the changing tide of the industry, MinXray could have done one of two things: (1) design an entirely new wheeled stand for the equipment needed to take digital x-rays; or (2) modify its existing XGS stand to include more spaces to house the additional equipment needed for digital x-rays. Kretchmer Aff. ¶ 5.

As it so happens, in 2005, McNamee developed a way to modify MinXray's XGS stand to hold digital x-ray equipment, obviating the need for PPX to purchase new stands from Canon or Source-Ray. McNamee Dep. 25:8-27:13. McNamee created and welded (or had someone weld) onto the stand a housing for various electronic components; a housing for the digital screen; and a shelf, with handles, that fits a laptop computer. *Id.* at 27:19-29:12. He called his invention the Digital Imaging Housing Package (DIHP). Kretchmer Dep. at 20:10-18. By 2006, PPX was using its fleet of XGS stands, modified with the DIHP, to take around 1,0000 digital x-rays a month. McNamee Dep. at 30:8-12. Despite this, McNamee did not apply for a patent on the DIHP. *Id.* at 57:3-8.

By mid-2006, MinXray had gotten wind of McNamee's design and approached him about using the DIHP to modify XGS stands for its other customers. McNamee Dep. at 37:14-39:18. In October 2006, the two parties entered into a non-disclosure agreement in which MinXray agreed not to use information about McNamee's invention unless and until the parties entered into a business relationship. R. 1.1, 2006 Non-Disclosure Agreement. A year and a half later, McNamee and MinXray entered into a licensing and royalty agreement for the DIHP. R. 1-2, 2008 License Agreement. It provided MinXray with permission to use the DIHP invention to

3

modify its XGS stands for seven years, until 2015. *Id.* § 3.1. In exchange, MinXray would pay McNamee a royalty fee of $2,500 for each unit sold that incorporated the DIHP. *Id.* § 6. Once the royalty period ended in May 2015, the license would convert to a royalty-free, perpetual license to MinXray for the DIHP. *Id.* § 3.1. The agreement also contained a list of definitions, including a definition of the licensed "Product":

> Product shall mean McNamee's Digital Imaging Housing Package, which consists of three main components when sold by Licensee as either an integrated OEM assembly, or as an integrated retrofit system, for use in a portable stand together with Licensee's Equipment, the components for which Digital Imaging Housing Package are described as follows:
>
> Component A: Digital Panel Detector Storage Compartment. The first component is a heavy-duty stainless steel box mounted in the middle position of the rear side of a portable stand. That box provides a sturdy, protective storage sleeve for a flat panel detector.
>
> Component B: Power/Interface Component and Configuration. The second component is a heavy-duty stainless steel box mounted to the lower portion of the front side of a portable stand, which houses McNamee's power/data interface configuration. McNamee's configuration allows for the proper distribution of power to, and transfer of data between, an x-ray generator, a laptop computer and a flat panel detector. This configuration also allows for a flat panel detector to directly control an x-ray generator for the purposes of x-ray exposure.
>
> Component C: Laptop Platform Handle. The third component is a heavy-duty stainless steel handle mounted on the upper portion of the rear side of a portable stand. The handle provides a performance platform for a laptop computer. Two wheels are affixed to the handle to allow for easy, stable loading and unloading of a complete mobile direct digital radiography system to and from a transport vehicle.

2008 License Agreement, Exh. A. ¶ 3. It is undisputed that, between May 2008 and May 2015, MinXray sold 112 XGS stands modified with the DIHP. Pl.'s Resp. DSOF ¶ 12. It is likewise undisputed that MinXray paid McNamee a royalty on all of those sales. *Id*; *see also* Kretchmer Aff. ¶ 6.

McNamee brought this action in 2017 and argues that MinXray is liable on one of two alternative theories. First, in Count One, McNamee argues that MinXray implemented McNamee's proprietary, "non-DIHP" technology in its products, in violation of the 2006 Non-Disclosure Agreement. R. 1, Compl. ¶ 18. Second, in Count 2, McNamee asserts that MinXray used components of his DIHP technology in two products other than the XGS that were sold between 2008 and 2015—the CMDR-2SLW and the Integris. *Id.* ¶¶ 22, 23. According to McNamee, MinXray incorporated in these two products the "power/data interface configuration" and the "laptop platform handle," two components of the DIHP invention, so MinXray owes additional royalties. R. 39, Pl.'s Br. at 6-12; Compl. ¶ 22. It is undisputed that MinXray sold nine units of the CMDR-2SLW and no units of the Integris between 2008 and 2015. Pl.'s Resp. to DSOF ¶ 17. *See also* Kretchmer Aff. ¶ 7. Finally, as part of Count 2, McNamee requests that the Court declare that MinXray's royalty-free license—which began in May 2015—is null and void, because MinXray's full payment of the royalties owed to McNamee was a condition precedent of the royalty-free license. Compl. ¶ 23; Pl.'s Br. at 12-17.

Both parties now move for summary judgment. In its motion, MinXray first argues that Count One fails because the only technology McNamee ever invented is the DIHP, so there is no "non-DIHP" technology that MinXray misappropriated. R. 36, Def.'s Mot. ¶5(A). MinXray also argues that Count 2 fails because neither the CMDR-2SLW nor the Integris integrated the DIHP technology, and in any event, MinXray has never sold any units of the Integris product. *Id.* ¶ 5(B). For his part,

5

McNamee asserts that no reasonable trier of fact could find in favor of MinXray on Count 2 because (1) the CMDR-2SLW clearly integrates his DIHP technology; and (2) the payment of royalties due to him was a condition precedent for MinXray to obtain the royalty-free license. Pl.'s Br. at 6-17.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[2] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Count One: 2006 Non-Disclosure Agreement

To start, the Court considers McNamee's claim that MinXray breached the parties' 2006 Non-Disclosure Agreement when it made use of his "non-DIHP" technical and/or proprietary information. Compl. ¶¶ 18-20. In its motion, MinXray argues that it is entitled to summary judgment on this claim because McNamee admitted that the only thing he ever invented—and, thus, shared with MinXray—was the DIHP technology. Def.'s Br. at 9-10. In his brief, McNamee concedes that, through the course of discovery, he determined that the non-DIHP information that he "provided MinXray was not 'proprietary' within the terms of the 2006 Agreement" and states that he withdraws Count One. Pl.'s Br. at 1, n. 1.

MinXray is correct to point out that "withdrawing" a claim or count in the middle of summary judgment briefing is not exactly the same as dismissing a claim under Rule 41. Def.'s Reply at 2 (citing Fed. R. Civ. P. 41). With no response, and in light of McNamee's concession, McNamee Dep. at 42:16-21, 44:4-9, the Court grants summary judgment against Count One, which is dismissed with prejudice.

### B. Count Two: 2008 License Agreement

Next is the heart of the parties' motions—McNamee's claim that MinXray breached the 2008 License Agreement when it allegedly incorporated some of the components of the DIHP technology in products for which it did not pay a royalty fee to McNamee. As an initial matter, McNamee concedes that MinXray sold no units of

the Integris during the relevant time-period, Pl. Br. at 1, n.1, meaning, regardless of the technology implemented in that product, MinXray owes no royalties on it. The only MinXray product at issue, then, is the CMDR-2SLW.

Under Minnesota law, "[t]he construction and effect of a contract presents a question of law, unless an ambiguity exists." *Brookfield Trade Ctr. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).[3] If a contract is susceptible to more than one reasonable interpretation based on its language alone, it is ambiguous. *In re SRC Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008) (applying Minnesota law). "Extrinsic evidence of the parties' subjective intent cannot be used to create contractual ambiguity where none exists on the face of the [agreement]." *Id*. Courts must also read contract terms in the context of the entire agreement, and the terms should not be construed in a manner that leads to a harsh and absurd result. *Brookfield Trade Ctr.*, 584 N.W.2d at 394. Finally, a contract should be interpreted in a manner that gives meaning to all of its provisions. *Id*.

**1. Definition of Product**

Under the terms of the 2008 License Agreement, MinXray received a license for McNamee's "Products,"[4] 2008 License Agreement ¶ 3.1, and was required to pay

---

[3] MinXray asserts that Minnesota law controls here because both agreements at issue contain Minnesota choice-of-law provisions. Def.'s Br. at 15, n. 2. *See also* 2006 Non-Disclosure Agreement ¶ 16; 2008 License Agreement ¶ 21. McNamee does not dispute this, so the Court will apply Minnesota law.

[4] One of the more curious things about the 2008 License Agreement is that it chooses to use the plural "Products" in various provisions of the Agreement, *see* 2008 License Agreement ¶¶ 3.1-3.3, 5.1, whereas the express Schedule of Definitions uses the singular "Product," *id.*, Exhibit A, Schedule of Definitions ¶ 3. If a reader looked only at the plural term, one could argue that this implies that the DIHP technology is comprised of more than one "Product," and MinXray is liable for a royalty payment any time it sells a unit

8

a royalty to McNamee for any "systems" it assembled that incorporated the "Product," *id.* ¶ 6. The term "Product" is defined in the "Schedule of Definitions," which is designated as Exhibit A to the Agreement. 2008 License Agreement, Exh. A ¶ 3. The definition starts out by saying that "Product shall mean McNamee's Digital Imaging Housing Package, which consists of three main components," and then goes on to list those three components: "Component A: Digital Panel Detector Storage Compartment"; "Component B: Power/Interface Compartment and Configuration"; and "Component C: Laptop Platform Handle." *Id.* ¶ 3. McNamee argues that he is entitled to royalties any time MinXray sells a product that uses any *one* of the three components covered by the definition of "Product." Pl. Br. at 8, 10-12. MinXray argues that it is only liable for royalties if it sells a product that incorporates all three components at once and, in any event, the CMDR-2SLW did not incorporate any of the components. Def. Br. at 11-14.

The Court need not reach MinXray's second argument because MinXray wins on the first: a reasonable jury must conclude that MinXray owed royalties only for stands that incorporated *all* three components of the Product in combination with one another. The definition of "Product" expressly states that it "consists of" the three components listed in Paragraph 3 of the Schedule of Definitions. The plain meaning

---

incorporating any one of the component "Products" that comprise the DIHP system. But McNamee did not make this argument in his summary judgment briefing, so it is forfeited. Even if McNamee had made it, it would have done no good. Exhibit A explains that the "Product," that is the DIHP system, "consists of three main components," meaning that the technology is not considered the "Product" unless all three components are present and used together. *Id.*, Exh. A ¶ 3.

9

of "consist" is "to become comprised."[5] So the "Product" is comprised of, or made up of, the three components. This interpretation is confirmed by a photo that the Agreement designates as Exhibit B. Paragraph 2 of the Agreement, which is captioned "Definitions," refers the reader to "the Schedule of Definitions attached as Exhibit A," and then states, "[f]urther, a photograph of the Product is attached hereto as Exhibit B." 2008 Agreement ¶ 2. Exhibit B contains the prefatory statement, "DIHP consists of," and then lists the three components. *Id.*, Exhibit B. The photo itself shows all three components. *Id.* If McNamee wanted to protect each component individually, then the Agreement should have been written in a way that defined each component itself as protected without reference to the other two. There is no ambiguity on the definition of Product, so there is no need to dive into the parties' intentions or extrinsic evidence. MinXray does not owe McNamee royalty payments for its sales of the CMDR-2SLW because that product did not make use of the licensed Product—the DIHP.

## 2. Royalty-Free License

In light of the holding that MinXray does not owe royalties on the CMDR-2SLW, it is not necessary to address McNamee's argument that MinXray should pay royalties even after the license period ended in 2015. The basis of that argument was MinXray's alleged failure to pay all of the royalties owed to McNamee between 2008 and 2015. *See* Pl. Br. at 12. Absent that premise, there is no reason to extend the royalty period past 2015.

---

[5] *See Consist*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 484 (1986).

Having said that, for the sake of completeness and to allow the parties to consider their next step, it is worth discussing the argument. The License Agreement provides for seven-years total as the royalty period, comprised of an initial two-year exclusive-license period and then a five-year non-exclusive period. 2008 License Agreement ¶ 3.2; *see also id.* ¶¶ 3.1, 6. After the five-year non-exclusive period, the license becomes royalty-free: "immediately after the conclusion of the aforementioned five-year term, such license shall convert to a worldwide, perpetual, paid-up, non-exclusive, royalty-free license." *Id.* ¶ 3.2. McNamee argues that this clause contains an implicit condition precedent, namely, that non-payment of royalties will prevent the royalty-free period from starting. Pl.'s Br. at 14 ("[T]hat condition is implicit in the language of the Agreement, as well as common sense.").

But under Minnesota law, "[a] condition precedent...will not be inferred absent unequivocal contract language." *Schneider v. U.S.G. Interiors, Inc.*, 1999 WL 171499, at *3 (Minn. App. 1999); *see also In re RFC & ResCap Liquidating Tr. Litig.*, 2015 WL 2451254, at *9 (D. Minn. May 21, 2015) ("[U]nder … Minnesota law, a conditions precedent defense requires the contract in question to clearly and unambiguously provide for this defense."). There is no such language in the License Agreement. Indeed, this case is an example of why the law's disfavor of *implied* conditions precedent makes sense: courts would be left to write, without concrete parameters, the conditions that contracting parties should have themselves considered. For example, in this case, what if the parties' dispute was over only one unit? If MinXray turned out to be wrong, then would the $2,500 dispute require the extension of the

royalty period for the entire time that MinXray did not pay the $2,500? Or would the extension be some proportional time period (and how would that be calculated)? Courts are not well positioned to write and re-write contractual provisions of this sort. Instead, if MinXray had failed to make the required royalty payments, then McNamee's recourse would be to sue for the payments (as he did) and to terminate the Agreement altogether in light of the breach. Termination would place the parties in the same positions they were in before they entered into the contract. MinXray would have no license. Whether McNamee has some basis to prevent further use of the Product would depend on other property rights (though he did not seek a patent on it), not on a re-write of the contract by the courts.[6]

---

[6] This holding caused the Court to question if the amount-in-controversy was really sufficient for diversity jurisdiction. The Seventh Circuit has explained that a case will be dismissed for inadequate amount-in-controversy only if it is "legally impossible" for the plaintiff to recover more than $75,000. *Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 274 (7th Cir. 2011); *Back Doctors Ltd v. Metropolitan Property and Cas. Ins. Co.*, 637 F.3d 827, 829 (7th Cir. 2011). Earlier in the case, the Court asked the parties to discuss the amount-in-controversy and file a statement. *See* R. 24, 5/30/17 Minute Entry. Both sides agreed that the amount was met. According to MinXray, there was more than $75,000 at stake in Count One because that claim sought (1) all profits earned by MinXray on sales of the CMDR-2SLW; and (b) a judgment declaring that future sales of the CMDR-2SLW violated the 2006 non-disclosure agreement. R. 26, Def.'s Stmt. on Subject Matter Jurisdiction at 4. Also—and this was crucial—MinXray cited to the one-way fee-shifting provision in the 2006 Non-Disclosure Agreement that permits McNamee to recover his attorney's fees for enforcing the Non-Disclosure Agreement. *Id. See also* 2006 Non-Disclosure Agreement § 13. Although ultimately McNamee had to retreat on Count One after discovery, it was not "legally impossible" for him to recover attorney's fees in light of the fee-shifting provision. The Court remains satisfied that diversity jurisdiction was proper.

## IV. Conclusion

For the reasons discussed, MinXray's motion for summary judgment is granted in its entirety. McNamee's motion for summary judgment is denied in its entirety. Judgment shall be entered in MinXray's favor. The status hearing of April 4, 2019 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2019